### NEW YORK MAIL & NEWSPAPER TRANSP. CO. v. SHEA.

(Supreme Court, Appellate Division, Second Department.   May 7, 1898.)

1. BROOKLYN BRIDGE—CONTROL—PNEUMATIC TUBES.

In an action to restrain the commissioner of bridges from interfering with the construction of plaintiff's pneumatic tubes across the New York and Brooklyn Bridge, it appeared that, by its act of incorporation, the plaintiff had received authority to construct and operate its tubes within and between cities. *Held*, that this did not by itself authorize it to lay the tubes along the bridge without further authority from the officers in control thereof.

2. SAME—BOARD OF TRUSTEES—POWERS.

Prior to the consolidation of the two cities, a board of trustees held exclusive control and management of the bridge, and by contract they had conferred upon the plaintiff the privilege of maintaining its tube line across the bridge. *Held*, that this action, involving no obstruction, danger, or interference with the proper functions of the bridge, was within the scope of their authority, and was binding on the commissioner who succeeded them, subject to the defendant's continuing power to regulate, manage, and maintain the bridge, and to his approval and reasonable regulations in respect to plaintiff's plans and manner of construction.

Appeal from special term, Kings county.

Action by the New York Mail & Newspaper Transportation Company against John L. Shea, individually and as commissioner of bridges of the city of New York. From an order granting an injunction restraining defendant from interfering with construction of plaintiff's pneumatic tubes across the New York and Brooklyn Bridge, defendant appeals. Modified.

Argued before GOODRICH, P. J., and CULLEN, BARTLETT, HATCH, and WOODWARD, JJ.

Almet F. Jenks, Asst. Corp. Counsel, for appellant.
Selden Bacon, for respondent.

CULLEN, J. The plaintiff was incorporated by chapter 164 of the Laws of 1893, which states, in section 1:

"The general purpose of such corporation shall be, and it is hereby authorized and empowered to construct, maintain and operate pneumatic tubes and other devices for the speedy transmission and delivery of the mails, newspapers and parcels within and between the cities of this state."

By other sections of the statute the corporation was empowered, without further authority of law or ordinance—

"To locate, to construct, to maintain and to operate tubes not to exceed three feet in diameter, between the central post offices and the branch post offices, and newspaper offices and postal stations in said cities of this state, by such route or routes as shall be determined by said corporation."

.The plaintiff is about to establish a tube line of eight inches in diameter between the post office in Brooklyn and that in New York. In 1897, by two contracts, made with the late board of trustees of the New York and Brooklyn Bridge, it obtained the privilege for a term of years of maintaining the tube line across the bridge. By the statute consolidating the two cities, the board of trustees has been abolished, and all its powers are now vested in the defendant. The plaintiff commenced the construction of its tube line since consolidation, and was stopped in its work by the defendant, on the ground that the action of the board of trustees was without authority in law.

The first claim of the plaintiff is that, by virtue of its statutory franchise, it had the right to lay its tubes along the bridge without further authority or consent from the officers in control of that structure. I think this proposition cannot be sustained. "The general principle that land once taken and appropriated to a public use, pursuant to law, under the right of eminent domain, cannot, under general laws and without special authority from the legislature, be appropriated to a different public use, is well established." Railroad Co. v. Williamson, 91 N. Y. 552; In re City of Buffalo, 68 N. Y. 167. It is true that the grant of the plaintiff's franchise is by a special law, and not by a general statute; but the grant itself (if it includes the right to enter upon streets and highways) is of so general a character as to fall within the reason of the rule laid down. It would be unreasonable to suppose that the legislature intended to confer, by a general grant of power, the right to enter upon so exceptional a structure as the Brooklyn Bridge without the permission of the public officers to whom the maintenance and care of the bridge were confided. The right of the plaintiff to lay its tube line upon the bridge must therefore be found, if at all, in the action of the trustees of the bridge.

The learned counsel for the appellant insists that the action of the trustees was beyond their powers, and illegal. It must first be observed that the trustees did not assume to grant any "fran-

chise" to the plaintiff, in the proper sense of that term.   The plain-
tiff's franchise proceeded from the act of the legislature, and the
contract with the trustees merely gave the plaintiff permission to
enter the bridge in the exercise of that franchise.   There is no
statute conferring in express terms upon the trustees of the bridge
power to contract with private parties for the use of any part of the
public property held as part of or in connection with the bridge
structure, except that of 1897, with reference to railroads.   The
general rule of law is that municipal corporations cannot, without
express statutory authority, alienate or dispose of property of a
public nature in violation of the trust upon which it is held.   2
Dill. Mun. Corp. § 575.   Nor can they make a contract "incon-
sistent with the continuously operative duty to make such by-laws,
rules, and regulations as the public interest or welfare of the city
may require."   Syracuse Water Co. v. City of Syracuse, 116 N. Y.
167, 22 N. E. 381; Richmond County Gaslight Co. v. Town of Middle-
town, 59 N. Y. 228.   But it has the implied right to lease or dis-
pose of property, real or personal, of the corporation of a private
nature, unless restrained by charter or statute.   2 Dill. Mun. Corp.
§§ 575, 580.   In French v. Inhabitants of Quincy, 3 Allen, 9, it was
held that, if a town house contained rooms not wanted for the
time being for municipal business, the town might let them tem-
porarily, or allow them to be used gratuitously.   In Spaulding v.
City of Lowell, 23 Pick. 71, it was held that the town might use
the second story of a market house, not required for the market,
for other purposes.   In Worden v. City of New Bedford, 131 Mass.
23, it was held that a city has the right to allow a building, erected
for municipal purposes, to be used incidentally for other purposes,
either gratuitously or for compensation.   In Bell v. City of Platte-
ville, 71 Wis. 139, 36 N. W. 831, it was held that a city might lease
the city hall for entertainments.   To the same effect, see Stone v.
City of Oconomowoc, 71 Wis. 156, 36 N. W. 829.

As already stated, the Brooklyn Bridge is a structure of excep-
tional character.   The sole object of its construction was to afford
a passage for the public from city to city, the same as in the case
of an ordinary street or highway.   But, for its proper construc-
tion, it was necessary to acquire the fee of the land over which
it passed, and the piers or wharves at the points where it crossed
the river.   It was also necessary that it should cross the river at
an elevation of 135 feet, in order that it might not obstruct naviga-
tion.   From this it followed that the approaches on the land for
a long distance are far above the ordinary buildings.   At the land
ends of the bridge these approaches consist of a series of arches,
which have been converted into store houses.   It thus appears
that, as to a substantial part of the land and structure of the
bridge, its exclusive use is not necessary for the proper mainte-
nance of the bridge, and the same could be profitably devoted to
private use.   Thus, this municipal structure and property has al-
ways had two aspects,—one, that of public property; the other,
that of private property.   From the time of the construction of
the bridge, it has been the practice and policy of the trustees to

farm out such private privileges as did not interfere with or obstruct its public use. The warehouses in the arches, the buildings under the suspended parts of the superstructure, and the piers or wharves along the river, have been rented out to private tenants. Privileges of stringing under the bridge proper telephone and telegraph wires have also been given out, for compensation. This practice has received the sanction of the legislature, for, by chapter 563 of the Laws of 1887, the trustees were authorized to regulate the use, by lessees or occupants, of real property held for the purposes of the bridge, and to collect the rents in their own name. By the statute which changed the bridge, the construction of which was originally commenced by a private corporation, into a public work of the two cities of New York and Brooklyn (chapter 300 of the Laws of 1875), all the powers of the directors of the corporation were vested in the trustees, whose appointment was provided for by the act. It cannot be denied that the board of directors of the old corporation would have had ample authority to grant these private privileges, which in no manner interfered with or obstructed the public use of the bridge. In my opinion, the same power was transferred to and vested in the trustees. Certainly, if the authority existed at all, it was in that body, for by the statute the trustees were given exclusive control and management of this property and structure. It is neither asserted in the affidavits on the part of the defendant, nor was it contended for on the argument in his behalf, that the plaintiff's tube line, to any extent, obstructs public travel on the bridge, endangers its safety, or interferes with its proper maintenance. We think, therefore, it was one of those private privileges similar to the stringing of the telephone and telegraph wires, or the leasing of the stores, which were within the power of the trustees to grant.

While we have thus asserted our view that the contract with the plaintiff was valid and binding, we do not mean to be understood as holding that the trustees of the bridge could in any wise limit the continuous power and duty of their successors to regulate, manage, and maintain the bridge for the greatest efficiency in the paramount purpose of its construction,—that of public travel. If, at any time, the plans of the authorities in the control of the bridge, made in good faith, require a change in the location of the plaintiff's tube line, or even a total abrogation of its privilege, the plaintiff must submit. Its contract and all similar contracts must be construed as made subject to what we may term the "governmental" or "legislative" power of the bridge authorities over its public use. But as long as similar privileges are granted, and operate in no way to the detriment of the public travel on the bridge, they are properly the subject of contract, and cannot capriciously and unreasonably be taken away. The order below, however, goes too far. It restrains the defendant and his deputies from interfering with or obstructing the plaintiff in laying down its tubes in accordance with the plans mentioned and described in the complaint. It should provide that the plans of the work and the manner of its construction shall be subject to the approval and reasonable regulations of the defendant. All concur.